Nelson J.,
delivered the opinion of tbe Court.
Prior to tbe year 1861, but at a time not distinctly stated, complainant held certain notes on E. J. Russell, amounting to $470,'which he transferred to A. C. Young, who obtained judgments thereon, in the month of March, 1861, before a justice, against complainant and said Russell. Russell procured one Sandy Hickey to become stay- or of the judgments; and, for his indemnity, executed to him an informal mortgage, upon the three hundred acres of land, and certain personal property in the pleadings mentioned, bearing date and registered on the 29th of March, 1861.. The mortgage contains no power of sale, but was executed for the implied purpose of indemnifying said Hickey, as security of the mortgagor to four different creditors, whose debts are described; and, among them the debts due to Young, which, as the deed recites, was to be stayed by the mortgagee for the mortgagor. Russell, the mortgagor, was permitted to retain possession of the property. Part of the personal property was sold or disposed of by him, a part by his wife after he went into the army; two of the “colts” died, and the residue was lost during the war. He paid one of the debts, provided for in the mortgage, of $230, due to Daniel S. Brown, leaving the other debts therein mentioned unpaid. On or about the 26th of October, 1862, Russell sold the land to Absalom Martin, who states that he paid therefor $665, in Confederate money, and $885, in horses.
Russell, in his deposition, states, that Martin was to make payment in Confederate money, but actually paid in horses, “at low prices,” which he, Russell, took to Missis *528 sippi, and sold. Martin and Russell concur in the statement that Hickey had knowledge of the sale, and Martin states that he handed “$500, or the rise,” to Hickey, and his understanding was, that it was to go to the satisfaction of the deed of trust.
Russell executed a deed to Martin, to which Hickey was a witness, and Martin took possession of the land and held it for a few months, when he sold it to Abraham Saylors. The deed from Russell to Martin was not registered, and when Martin sold to Saylors, it was delivered up and a deed was executed in its place, by Russell to A. Saylors, on the 4th of October, 1862, which was duly registered 4th of September, 1865; and, under this deed, Saylors, the defendant, claims title. The consideration paid by A. Saylors, was $1,950, in horses, cash notes, and Confederate money; the precise proportions of each not being stated. Martin states it as his understanding, when he paid the Confederate money to Hickey, that the mortgage debts were to be satisfied; that he thought he had a good title, and that A. Saylors understood it in that way; but admits that none of the beneficiaries named in the mortgage were present, or had any knowledge of these transactions. Russell states that when he made the trade with Martin, the latter knew that the mortgage deed was in existence, and that they talked about about it, but says he gave A. Saylors no information on the subject. He says, further, that he and Hickey were, at one time, brothers-in-law, and that he afterwards married Hickey’s daughter, but that Hickey had no previous knowledge of his intention to dispose of the personal property. It is also shown that Hickey and Abraham *529 Saylors are broth ers-in-law. A. L. Potts, sheriff, states that he, at one time had executions in his hands, on the judgments in favor of Young, against complainants, Russell and Hickey, and that he could find no property of the two latter on which to make a levy. There is some parol evidence tending to show that Hickey owns a small tract of land in Cumberland county, worth about $200, and that complainant lives in Putnam county; but this evidence is of little consequence in the view we take of this case.
It may be observed that the defendant, A. Saylors, does not, either in form or substance, plead that he is an innocent purchaser for a valuable consideration without notice. He virtually admits that when he purchased the land, he had full knowledge of the existence of the deed of trust, but places his defense upon the grounds that the deed, as he alleges, was fraudulent, and that he had satisfactory information from Russell, Hickey and Martin, that the deed of trust was released and discharged, and that the deed from Russell to Martin was witnessed by Hickey. He states that he paid Martin $1,850 for the land — $593 in cash notes, $75 in a horse, and the balance in money — but does not aver that the vendor was seized or pretended to be seized in fee, or state who were the makers of the cash notes, or that the beneficiaries had knowledge of his purchase; and, in other respects, his defense fails to meet the requirements of the numerous cases heretofore determined by this Court, and cited in Heis. Dig., 552, 556.
*530 The mere fact that Russell was permitted to retain possession of the personal property, conveyed by the mortgagor, and that he disposed of it without the knowledge or concurrence of Hickey, did not render the mortgage void as to the land: See cases cited in Heis. Dig., 391, 393.
The mortgage, as already stated, is informal. It conveys to Silas Hickey, in addition to the, personal property, the tract of 260 acres of land in While county, in fee simple, and then follows the declaration: “But this deed is made for the following uses: that is to say, that the said Hiekey is my security to W. L. Gracey on a debt for $150; to A. Ditty on a note for $125; is to stay a debt for me, going to A. C. Young, for $470; and, also, to secure a debt due from me to Daniel P. Brown for $230, and pay the same for me, or stay it, if sued upon same. Should I pay all of said debts above named, then, and in that event, this deed is to be void; then [otherwise] to be and remain in full force and virtue in law.” This provision in the deed is a sufficient declaration, in the view of a Court of Equity, of a trust in favor of the creditors therein named, whose debts were secured, or intended to be secured, through Hickey, the mortgagee. In the case of Breedlove v. Stump, 3 Yer., 257, this Court, John J. White, Special Judge, delivering the opinion, declared that “the person for whose benefit a trust is created, who is to be the ultimate receiver of money, may sustain a suit in equity, to have it paid directly to himself.” It was said further, that “the ered- *531 itor is entitled to the benefit of all the securities the principal debtor has given to his surety, and that the surety has an equity to the benefit of all the securities the principal gives to the creditor:’'' Ibid, 263. In Stockard v. Stockard, 7 Hum., 303, where it appeared that W. Craig was the drawer of a note, upon which Johnson Craig was first, John Stockard second, and Samuel Stockard third indorser; and that Craig, the maker, and his wife, had sold a tract of land to Samuel Stockard, the last indorser, who agreed to pay the note out of the purchase money, but afterwards credited it, upon a settlement of their accounts, on a claim which he personally held against Craig, in consequence of which John Stockard, the second indorser, was compelled to pay the note, it was held that the law implied a trust for the benefit of the second indorser, whose assent to the arrangement, as it was for his benefit, was presumed. In that case, it was expressly declared that the trust can not “be revoked after the trustee had taken upon himself the trust, unless the beneficiary dissents therefrom:" Ibid, 307; see also 2 Sneed, 95; Meigs R., 169; 3 Hum., 547; 2 Head, 202; Ibid, 549; 5 Sneed, 91; 2 Cold., 91, on the general subject of suretyship and substitution. It follows, from these authorities, that the mortgage executed to Hickey enured to the benefit of all the creditors named therein; that as no power of sale was vested in Hickey, he could not sell, or assent to the sale of the land, without the assent of the beneficiaries, or the aid of a court of equity; that the registration of the mortgage was, of itself, notice to Abraham Saylors; and especially, that as *532 its existence was spoken of at the time of his purchase, he was bound to ascertain from the beneficiaries, and not from the statements of the mortgagor and mortgagee, whether the debts intended to be secured had been satisfied; and, failing to do so, the deed taken by him is fraudulent and utterly null and void as to such of the creditors as have not been paid: See Dixon on Bubrogation, ill.
Whether the complainant, without paying the debts, for which he is liable, is entitled to a decree, is a question not entirely free from embarrassment. In Williams v. Tipton, 5 Hum., 67, it was held that the sureties to an official bond of a sheriff, who had been compelled to make certain payments on account of the defaults of their principal, and filed their bill, in anticipation of further liabilities, to set aside a fraudulent conveyance made by him, could only be relieved to the extent of the actual payments made by them, and could not, upon a quia timet principle, maintain their bill before loss incurred or payment made. In Gilliam v. Esselman, 5 Sneed, 88, 89, it was held that no equity exists in favor of a surety, to be substituted to the rights of the creditor, without having previously discharged the debt. In Henry v. Compton, 2 Head, 552, it was ■determined, in accordance with certain North Carolina .cases there cited, that, where the principal debtor has become insolvent, and his property is bound for the debt to the creditor, “his sureties have an interest in it, so far as to compel its application to their discharge and exoneration, in preference to the general creditors of their principal, or j>m’chasers from him;” and this *533 without a previous payment of the debt. A similar principle was announced in Howell v. Cobb, 2 Cold., 105, 106. See, also, Kinsey v. McDearmon, 5 Cold., 395. In Green v. Starnes, 1 Heis., 582, that, within the meaning of the Code, section 4288. as to setting aside fraudulent conveyances, “ a surety, before payment of the debt, is a creditor, in such a sense as that he may .bring his principal and the creditor into a court of equity, and obtain exoneration out of the property, real or personal, fraudulently conveyed by the former, or its proceeds in the hands of any one who is not a bona fide purchaser without notice.” The complainant in this case, as indorser upon the notes, stands in the relation of surety of Russell, the maker. Judgments were obtained against him as well as Russell; and there can be no question that, on payment of the judgment, he would have a remedy against the maker. The security taken by the stayor enured to his benefit as well as that of the creditor, and as the conveyance to the defendant was fraudulent, no sound reason exists why it may not be set aside in favor of the one as well as the other. Any decree obtained by the complainant, would enure to the benefit of the creditor; and, although it would have been more regular to bring the latter before the Court, the irregularity may be obviated by declaring upon the face of the decree that it is for his benefit, and remanding the cause to the end that he may bring forward his claims by petition, without the trouble and expense 'of a new suit or protracted litigation. This is in substantial accordance with the practice established *534 in Birdsong v. Birdsong, 2 Head, 298, 301, 302. See, also, Mims v. Mims, 1 Hum., 430, 431; Rowan v. Mercer, 10 Hum., 361, 364.
So mucb of the Chancellor’s decree as declares the complainant’s right to a recovery, and declares that the land conveyed is liable to its satisfaction, will be affirmed; but as the decree allows the amount adjudged in favor of complainant to be credited with any sums already paid on the judgments at law, the cause will be remanded for the purpose of taking an account, and of allowing A. C. Young to become a party, and the other beneficiaries, if necessary.
The costs in this Court will be divided between the parties.